UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD SUMMERVILLE, Derivatively on Behalf of UNITED STATES STEEL CORPORATION, | ) ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DAVID B. BURRITT, DAVID S. SUTHERLAND, JOHN G. DROSDICK, GLENDA G. MCNEAL, PATRICIA A. TRACEY, DAN O. DINGES, JOHN J. ENGEL, MURRY S. GERBER, PATRICIA DIAZ DENNIS, ROBERT J. STEVENS, PAUL A. MASCARENAS, STEPHEN J. GIRSKY, and MARIO LONGHI, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| UNITED STATES STEEL CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant United States Steel Corporation ("U.S. Steel" or the "Company") against certain of its officers and directors for violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.   These wrongs resulted in hundreds of millions of dollars to U.S. Steel and other damages, such as to its reputation and goodwill.

2.      U.S. Steel is an integrated steel producer[1] of flat-rolled and tubular products with major production operations in North America and Europe.   U.S. Steel has three reportable operating segments, with its Flat-Rolled Products ("Flat-Rolled") segment accounting for over 70% of the Company's net sales in 2016.   U.S. Steel's Flat-Rolled segment provides products to a variety of industries, including service center, conversion, transportation, construction, container, and appliance and electrical markets.

3.      The Company's Flat-Rolled segment has faced several challenges associated with unfavorable market conditions over the past several years.   These economic challenges included dramatically lower oil prices, lower steel prices, a stronger U.S. dollar, global overcapacity, and an increase in foreign imports flooding the market.

4.      In 2013, to address these challenges, U.S. Steel embarked on a strategic initiative named the "Carnegie Way," after the Company's co-founder Andrew Carnegie, "to address the new realities of the marketplace."   The alleged objective of the Carnegie Way was to "add value, respond to customer needs, get leaner faster, right-size operations and improve our performance across our core business process capabilities."

---

[1] An integrated steel producer uses iron ore and coke as raw material to produce steel.

5.      In 2016, U.S. Steel's fiduciaries publicly pushed two phases as part of the Carnegie Way continuum that were focused on long-term growth: "(1) earn the right to grow, and (2) drive and sustain profitable growth."  In its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, filed with the SEC (the "2016 Form 10-K"), the Company touted $745 million in benefits associated with the Carnegie Way, despite a net loss of $440 million for the year, allegedly showing "significant progress toward … economic profit."  According to the Form 10-K, the Carnegie Way was responsible for driving "a shift in the Company that has enabled us to withstand the prolonged downturn in steel prices while positioning us for success in a market recovery."

6.      However, the Company's reported focus on growth and right-size operations under the umbrella of the Carnegie Way was a façade.  U.S. Steel was in fact engaging in ill-advised cost cutting and underspending on capital assets that simply pushed off repairs and upgrades until a later date.  Doing so not only disguised the Company's true condition, but jeopardized its ability to capitalize when the market turned.  In an article published by the *Pittsburgh Post-Gazette* on November 3, 2016, an Axiom Capital Management analyst was quoted as stating that U.S. Steel was "clearly underspending on maintenance capital expenditures," spending less on taking care of equipment as a result of the Carnegie Way initiative.  The article further highlighted the possible increase in unplanned outages at facilities due to this "aggressive cost cutting," in opposition to the image of revitalization projected by the Company.

7.      The steel market recovered in the first fiscal quarter of 2017, when the average price of U.S. hot-rolled steel coil rose by more than 50% from the previous year, assisted by favorable U.S. trade cases against foreign imports.  With hot-rolled steel coil making up 28% of

all products sold in the Company's Flat-Rolled segment, U.S. Steel should have translated this price increase into a favorable turnaround in profitability from the domestic sales of its hot-rolled product.

8.     Instead of being poised to take advantage of a pricing turnaround due to the Carnegie Way, in an April 25, 2017 press release after markets closed, U.S. Steel reported financial results showing a decline in the Company's Flat-Rolled segment due to facility outages. Even with the hot-rolled steel price surge, the Company reported a net loss of $180 million, or negative $1.03 per diluted share.  Adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA") was $74 million, compared to $211 million in the previous fiscal quarter.  U.S. Steel was also forced to adjust its 2017 financial outlook, including a marked reduction in EBITDA guidance.  Reconfigured for an accounting change, the adjusted diluted earnings per share ("EPS") was $0.83, a 72% cut from the previous EPS guidance for 2017.

9.     The following day on April 26, 2017, during an earnings conference call with investors and analysts, defendant Mario Longhi ("Longhi"), U.S. Steel's then-Chief Executive Officer ("CEO"), and defendant David B. Burritt ("Burritt"), U.S. Steel's then-Chief Operating Officer ("COO") and Chief Financial Officer ("CFO"), revealed that the Company would need to invest in asset revitalization, exceeding $300 million for 2017 and more than $1 billion over the next several years.

10.     The response to the Company's disclosures was swift and severe.  U.S. Steel's stock plunged more than 26%, or $8.33 per share on April 26, 2017, to close at $22.78 compared to the previous trading day's closing of $31.11, erasing more than $1.4 billion in market capitalization.

11.     On May 10, 2017, in the wake of the dismal financial results for the first fiscal quarter, the Company announced the retirement of defendant Longhi as CEO, to be succeeded by the COO and CFO, defendant Burritt.  Despite his participation in the wrongdoing, defendant Longhi received over $22 million for his departure.  Further, defendant Burritt, the former CFO and COO, will receive additional compensation for assuming the role of CEO and President, including an increased salary and incentives of over $10 million.

12.     Further, as a direct result of this unlawful course of conduct, the Company is now the subject of numerous federal securities class action lawsuits filed in the United States District Court for the Western District of Pennsylvania on behalf of investors who purchased U.S. Steel's shares.

13.     U.S. Steel's 2017 Proxy Statement, filed with the SEC on March 14, 2017 (the "2017 "Proxy"), requested stockholders vote in favor of defendants Patricia Diaz Dennis ("Dennis"), Dan O. Dinges ("Dinges"), John G. Drosdick ("Drosdick"), John J. Engel ("Engel"), Murry S. Gerber ("Gerber"), Stephen J. Girsky ("Girsky"), Longhi, Paul A. Mascarenas ("Mascarenas"), Glenda G. McNeal ("McNeal"), Robert J. Stevens ("Stevens"), David S. Sutherland ("Sutherland"), and Patricia A. Tracey ("Tracey") to the Board of Directors (the "Board") during the Annual Meeting of Stockholders held on April 25, 2017.  The proxy solicitation contained materially false and misleading statements about the Board's oversight of risk and the Company and its operating plan.  If the stockholders knew the truth about U.S. Steel's misguided business strategy under the Carnegie Way—revealed only after the stockholders had already voted on April 25, 2017—stockholders would not have voted to reelect the faithless fiduciaries that failed to exercise oversight of the Company.

14.     Plaintiff brings this action to hold the Individual Defendants (as defined herein) accountable for their wrongdoing associated with their improper statements and rectify the harm to the Company for which the defendants are responsible.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

16.     The Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper under 28 U.S.C. §1391 because U.S. Steel maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

19.     Plaintiff Richard Summerville was a stockholder of U.S. Steel at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current U.S. Steel stockholder.  Plaintiff is a citizen of Alabama.

**Nominal Defendant**

20.     Nominal Defendant U.S. Steel is a Delaware corporation with principal executive offices located at 600 Grant Street, Pittsburgh, Pennsylvania.  Accordingly, U.S. Steel is a citizen of Delaware and Pennsylvania.  U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in North America and Europe.  U.S. Steel's customers principally operate in the automotive, consumer, industrial, and oil country tubular goods markets.  U.S. Steel is also involved in other business activities consisting primarily of railroad services and real estate operations.   As of December 31, 2016, U.S. Steel had approximately 29,800 employees.

**Defendants**

21.     Defendant Burritt is U.S. Steel's CEO and a director and has been since May 2017, and President and has been since February 2017.  Defendant Burritt was also U.S. Steel's COO from February 2017 to May 2017, CFO from September 2013 to May 2017, and Executive Vice President from September 2013 to February 2017.  Defendant Burritt is also named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Burritt knowingly, recklessly, or with gross negligence: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure

procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy.  U.S. Steel paid defendant Burritt the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $800,000 | $891,720 | $447,864 | $1,820,000 | $116,000 | $4,075,584 |

Defendant Burritt is a citizen of Pennsylvania.

22.     Defendant Sutherland is U.S. Steel's Chairman of the Board and has been since January 2014, and a director and has been since July 2008.  Defendant Sutherland is also a member of U.S. Steel's Audit Committee and has been since at least March 2016.  Defendant Sutherland knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy.  U.S. Steel paid defendant Sutherland the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|-------------|--------------|-------|
| 2016 | $250,000 | $250,000 |

Defendant Sutherland is a citizen of Canada.

23.     Defendant Drosdick is a U.S. Steel director and has been since March 2003.  Defendant Drosdick knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy.  U.S. Steel paid defendant Drosdick the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $110,000 | $110,000 | $220,000 |

Defendant Drosdick is a citizen of Pennsylvania.

24.     Defendant McNeal is a U.S. Steel director and has been since April 2007. Defendant McNeal is also a member of U.S. Steel's Audit Committee and has been since at least March 2016.  Defendant McNeal knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy. U.S. Steel paid defendant McNeal the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $100,000 | $100,000 | $200,000 |

Defendant McNeal is a citizen of New Jersey.

25.     Defendant Tracey is a U.S. Steel director and has been since April 2007. Defendant Tracey knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy.  U.S. Steel paid defendant Tracey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $110,000 | $110,000 | $220,000 |

Defendant Tracey is a citizen of Virginia.

26.     Defendant Dinges is a U.S. Steel director and has been since April 2010. Defendant Dinges was also a member of U.S. Steel's Audit Committee from at least March 2016 to at least March 2017.  Defendant Dinges knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy.  U.S. Steel paid defendant Dinges the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $50,000 | $150,000 | $200,000 |

Defendant Dinges is a citizen of Texas.

27.     Defendant Engel is a U.S. Steel director and has been since April 2011. Defendant Engel is also the Chairman of U.S. Steel's Audit Committee and a member of that committee and has been since at least March 2016.  Defendant Engel knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy.   U.S. Steel paid defendant Engel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $110,000 | $110,000 | $220,000 |

Defendant Engel is a citizen of Pennsylvania.

28.     Defendant Gerber is a U.S. Steel director and has been since July 2012. Defendant Gerber is also a member of U.S. Steel's Audit Committee and has been since at least March 2016.  Defendant Gerber knowingly or recklessly: (i) caused or allowed U.S. Steel to

disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy. U.S. Steel paid defendant Gerber the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $100,000 | $100,000 | $200,000 |

Defendant Gerber is a citizen of Pennsylvania.

29.     Defendant Dennis is a U.S. Steel director and has been since January 2015. Defendant Dennis knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy. U.S. Steel paid defendant Dennis the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $100,000 | $100,000 | $200,000 |

Defendant Dennis is a citizen of Texas.

30.     Defendant Stevens is a U.S. Steel director and has been since January 2015. Defendant Stevens knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy. U.S. Steel paid defendant Stevens the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2016 | $200,000 | $200,000 |

Defendant Stevens is a citizen of Pennsylvania.

31.     Defendant Mascarenas is a U.S. Steel director and has been since March 2016. Defendant Mascarenas is also a member of U.S. Steel's Audit Committee and has been since at least June 2017.   Defendant Mascarenas knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy.  U.S. Steel paid defendant Mascarenas the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $83,333 | $102,473 | $185,806 |

Defendant Mascarenas is a citizen of Michigan.

32.     Defendant Girsky is a U.S. Steel director and has been since April 2016. Defendant Girsky is also a member of U.S. Steel's Audit Committee and has been since at least March 2017.   Defendant Girsky knowingly or recklessly: (i) caused or allowed U.S. Steel to disseminate improper statements concerning the Company's ability to capitalize on improved market conditions; (ii) failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii) made materially misleading statements in the Company's 2017 Proxy. U.S. Steel paid defendant Girsky the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2016 | $152,473 | $10,000 | $162,473 |

Defendant Girsky is a citizen of New York.

33.     Defendant Longhi was U.S. Steel's CEO from September 2013 to May 2017; a director from September 2013 to June 2017; President from June 2013 to February 2017; COO

from July 2012 to September 2013; and Executive Vice President from July 2012 to June 2013.

Defendant Longhi is also named as a defendant in related securities class action complaints that

allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Longhi knowingly,

recklessly, or with gross negligence: (i) caused or allowed U.S. Steel to disseminate improper

statements concerning the Company's ability to capitalize on improved market conditions; (ii)

failed to maintain adequate disclosure procedures with respect to U.S. Steel's operations; and (iii)

made materially misleading statements in the Company's 2017 Proxy.  U.S. Steel paid defendant

Longhi the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $1,500,000 | $2,837,507 | $1,425,049 | $4,528,125 | $632,670 | $10,923,351 |

Defendant Longhi is a citizen of Florida.

34.     The defendants identified in ¶¶21, 33 are referred to herein as the "Officer

Defendants."   The defendants identified in ¶¶21-33 are referred to herein as the "Director

Defendants."  The defendants identified in ¶¶22, 24, 26-28, 31-32 are referred to herein as the

"Audit Committee Defendants."  Collectively, the defendants identified in ¶¶21-33 are referred

to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

35.     By reason of their positions as officers and directors of the Company, each of the

Individual Defendants owed and owe U.S. Steel and its stockholders fiduciary obligations of

trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to

control and manage U.S. Steel in a fair, just, honest, and equitable manner.  The Individual

Defendants were and are required to act in furtherance of the best interests of U.S. Steel and not in furtherance of their personal interest or benefit.

36.     To discharge their duties, the officers and directors of U.S. Steel were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of U.S. Steel were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     properly and accurately guide the Company's stockholders and the public when speaking about U.S. Steel's financial condition at any given time, including making accurate statements about the Company's financial results, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(c)     ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(d)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)     remain informed as to how U.S. Steel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make

reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)      truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties of the Audit Committee Defendants**

37.      In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Dinges, Engel, Gerber, Girsky, Mascarenas, McNeal, and Sutherland, owed specific duties to U.S. Steel to assist the Board in overseeing: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and of the independent auditor.   Moreover, the Audit Committee's Charter provides certain duties and responsibilities with respect to its oversight of the integrity of the Company's financial statements, earnings press releases, and the type and presentation of information to be included in earnings press releases.   Furthermore, the Audit Committee is required to:

> [R]eview management's quarterly report evaluating internal control over financial reporting to determine that the Corporation's administrative, operational and internal accounting controls have been periodically reviewed and examined to determine whether the Corporation is operating in accordance with its prescribed procedures and codes of conduct, whether there are any significant deficiencies or material weaknesses in internal controls, and whether there has been any fraud by persons significantly involved in internal controls matters.

**Breaches of Duties**

38.      The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of U.S. Steel, the absence of good faith on their part, and a reckless disregard for their duties to the Company that

the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

39.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements, improper practices that wasted the Company's assets, and caused U.S. Steel to incur substantial damage.

40.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of U.S. Steel, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, U.S. Steel has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of U.S. Steel, regarding the Individual Defendants' management of U.S. Steel's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at U.S. Steel and the profits, power, and prestige that the Individual Defendants

enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

43.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

44.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

45.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPLEMENTATION OF THE CARNEGIE WAY

47.     U.S. Steel is an integrated steel producer of flat-rolled and tubular products with major production operations in the United States and Europe.  U.S. Steel provides several types of steel sheet and tubular steel products for the automotive, appliance, container, industrial machinery, construction, and oil and gas industries.  The Company divides its operations into three primary segments: Flat-Rolled, U.S. Steel European, and Tubular.  Within the Flat-Rolled segment, the sale of hot-rolled steel coil is prominent, making up 28% of all Flat-Rolled steel products sold by the Company.

48.     Beginning in 2013, U.S. Steel launched the "Carnegie Way," a strategic company-wide initiative that the Company alleged would be a "transformational process," enabling the Company to address changes in the market for steel.  The Company alleged that:

> With a more intense focus on cash flow and a strong balance sheet, and a revised approach to how we view shipment volume and production, the Corporation is working through a series of transformational initiatives that has enabled us to more effectively add value, get leaner faster, right-size our operations, and improve our performance across core business process capabilities, including: commercial; supply chain; manufacturing; procurement; innovation; and operational and functional support.

49.     In 2016, the Company continued to push the Carnegie Way initiative in its public filings.  In its Form 2016 10-K, the Company asserted that it would create stockholder value in two phases: "(1) earn the right to grow, and (2) drive and sustain profitable growth."  U.S. Steel claimed in late 2016 that the Carnegie Way would produce "a sustainable competitive advantage with a relentless focus on economic profit, our customers, cost structure, and innovation."  U.S. Steel also claimed that through the Carnegie Way philosophy, the Company had "launched a series of initiatives that we believe will enable us to add value, re-shape the Company, and improve our performance across our core business processes, including commercial, supply chain, manufacturing, procurement, innovation, and operational and functional support."

50.     Instead of improving and investing in its facilities during this period to encourage long-term growth, as the Company claimed, U.S. Steel was engaged in ill-advised cost cutting and underspending on capital assets, including in the Flat-Rolled segment.   With facilities woefully underfunded or shut down, the Company experienced unplanned outages at its facilities, jeopardizing the Company's ability to capitalize on improved market conditions.

51.     For example, a *Pittsburgh Post-Gazette* article entitled "Analysts Say U.S. Steel Cost-Cutting Hurting Operations, Safety," published November 3, 2016, highlighted the reality behind U.S. Steel's cost-cutting activities.   In the article, analysts expressed concerns that the Carnegie Way initiative had caused the Company to underspend on capital expenditures, including needed maintenance, threatening the Company's safety practices and its ability to prevent outages in facilities when the spot market rebounded.   Commenting on operational issues plaguing the Company, including unplanned outages at several facilities, the article stated:

> Axiom Capital Management analyst Gordon Johnson believes the problems occurred because U.S. Steel is spending less on taking care of its equipment.
>
> ***"They are clearly underspending on maintenance capital expenditures,"*** Mr. Johnson said in an interview.
>
> ***"They are understaffed and overworking workers"*** to the extent that they are jeopardizing safety, he added.
>
> Mr. Johnson cited a Sept. 30 fatality at the company's Gary, Ind., mill.   Union worker Jonathan Arrizola was repairing a crane with three other crew members when he was killed. Mr. Arrizola's wife told a local television station that her husband was looking for a new job because he was working 70 to 90 hours a week at the mill.
>
> Rodney Lewis Sr., president of United Steelworkers union Local 1014, criticized U.S. Steel for moving Mr. Arrizola and other workers around the Gary mill in an effort to cut costs.
>
> "Our company has decided that, to save a dollar, they'll farm people out all over this mill, which only increases the chances for accidents like these happening," Mr. Lewis wrote in an Oct. 1 Facebook post.   "Working with bare bones crews ain't cutting it."

It was not the first time Mr. Lewis took the company to task over cost-cutting. When U.S. Steel announced in April it was laying off 25 percent of its North American nonunion workforce, he called out the firing of two safety managers.

"There has always been a discernible line drawn between Operations and Safety. That line has now been blurred," he wrote in another Facebook post.  "This is a company in flux.  I wish I could tell you what the end game is with this company but truthfully speaking I doubt they have a clue."

Mr. Lewis did not return a call seeking comment.

Other workers have cited the impact that the Carnegie Way program has had on operations.  ***One former operations and maintenance employee who left voluntarily described the Carnegie Way as "a big joke" in an interview with the Post-Gazette last year.***

***The worker, who asked not to be identified, said purchasing managers in Pittsburgh had ordered his mill to use cheaper oils to lubricate bearings.***  That caused the bearings to wear out more quickly, resulting in extra costs and longer down time, the employee said.

Jefferies analyst Seth Rosenfeld told clients on Wednesday that he ***is "concerned these latest operational issues reflect assets under-investment during years of aggressive cost cutting."***

52.     Despite the increased scrutiny of the Company's precarious cost cutting, U.S. Steel continued to assure investors that it was poised to capitalize on any market upswing across all segments of its business.  For example, in the Company's 2016 Form 10-K, the Company claimed that "[t]he Carnegie Way has already driven a shift in the Company that has enabled us to withstand the prolonged downturn in steel prices while positioning us for success in a market recovery."

**IMPROPER STATEMENTS**

53.     During the relevant period, the Company attributed short-term improved financial results in the Flat-Rolled segment to the Carnegie Way in its financial reporting and public announcements.  In reality, these financial results came at the expense of needed expensive capital equipment upgrades.  The Company had been engaged in cutting costs and foregoing

investment in capital assets that would otherwise have allowed U.S. Steel to take advantage of improved market conditions in the long-term.  When the hot-rolled steel prices surged in the first fiscal quarter of 2017, the Company was unable to capitalize due to unplanned facility outages. Instead, U.S. Steel reported markedly dismal financial results, particularly in the Flat-Rolled segment, despite the Company's earlier promising guidance.

54.     In an earnings press release dated November 1, 2016, the Company announced financial results for the third quarter ended September 30, 2016.  The Company asserted that its net earnings were $51 million, or $0.32 per diluted share.   The Company also reported an operating cash flow of $264 million, an improvement from the previous two quarters.  The Flat-Rolled segment financial results allegedly improved from the second quarter as spot and contract prices increased, as well as "benefits from an improving product mix and our Carnegie Way initiatives continued to grow."  Downplaying operational issues that impacted shipments from the Company's Flat-Rolled facilities, U.S. Steel's President and CEO, defendant Longhi, stated:

> ***Our third quarter results improved significantly from the second quarter as each of our segments improved, resulting in our highest quarterly segment income since the fourth quarter of 2014.***  We faced some operational challenges that limited our ability to realize the full benefits of an improved pricing environment, but ***we continued to make progress in our Carnegie Way transformation efforts.  With our very strong cash and liquidity position, we remain focused on the investments that we need to continue to make to revitalize our facilities and deliver value-enhancing solutions for our customers.***

55.     Also, in the November 1, 2016 press release, defendant Longhi commented on the Company's 2016 financial outlook.  He claimed that while there were some unplanned facility outages, the Company would be investing capital and increasing maintenance to prevent further operational issues.  Despite this claim, the Company continued to engage in cost-cutting critical capital assets.  Defendant Longhi stated:

As we move through the rest of 2016, operational issues remain a headwind for us, as we continue to recover from unplanned outages in the third quarter, while also completing our planned maintenance outages. **_We have identified the critical assets that require additional capital investment and increased maintenance spending in order to improve our reliability and quality, and to lower our costs. We plan to use our strong cash and liquidity position to expedite the revitalization of our facilities and to fund additional growth projects. This will enhance the ongoing development of the differentiated solutions that make us a strategic business partner for our customers. We continue to make progress on our Carnegie Way transformation, and we have many opportunities ahead of us._**

56. On November 2, 2016, U.S. Steel repeated these promising financial results in its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016, filed with the SEC. When explaining the Flat-Rolled segment financial results, the Form 10-Q alleged an increase in results compared to the same period in 2015, stating:

The increase in Flat-Rolled results for the nine months ended September 30, 2016 compared to the same period in 2015 resulted from decreased raw materials costs (approximately $210 million), reduced losses in 2016 after the shutdown of the blast furnace and associated steel making assets and most of the finishing operations at Fairfield Works in the third quarter of 2015 (approximately $175 million), decreased spending for repairs and maintenance and other operating costs (approximately $115 million), lower energy costs, primarily natural gas costs (approximately $55 million) and reduced costs associated with lower operating rates at our mining operations (approximately $45 million). These changes were partially offset by lower average realized prices (approximately $460 million) as a result of market conditions and higher levels of imports, higher costs for profit based payments (approximately $50 million) and decreased shipment volumes (approximately $10 million).

Gross margin for the three months ended September 30, 2016 as compared to the same period in 2015 increased primarily as a result of higher average realized prices due to improved contract and spot market prices.

57. Also in the Form 10-Q, in a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Quarterly Report downplayed operational issues with the Company's Flat-Rolled facilities. Without mentioning the Company's ongoing cost cutting, the Form 10-Q stated:

Net sales were $2,686 million in the three months ended September 30, 2016, compared with $2,830 million in the same period last year.  The decrease in sales for the Flat-Rolled segment primarily reflected decreased shipments (decrease of 141 thousand net tons) due to operational issues across our Flat-Rolled facilities. In the last half of the third quarter of 2016 we experienced unplanned outages at several of our steelmaking and finishing facilities and our current operating configuration in 2016 extends the time it takes to recover volumes from unplanned outages.  Additionally, sales in our Flat-Rolled segment decreased due to reduced coke and iron ore pellet sales to U.S. Steel Canada Inc.  These decreases were partially offset by higher average realized prices (increase of $44 per net ton) due to improved spot market prices.

58.    Defendants Longhi and Burritt signed and certified the Form 10-Q pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") that the Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact regarding the operations of U.S. Steel.  The report additionally confirmed the effectiveness of the design and operation of its disclosure controls and procedures in a section entitled "Controls and Procedures."

59.    The Company also held a conference call with analysts and investors on November 2, 2016, to discuss the third quarter results, which defendants Longhi and Burritt attended.   Defendant Longhi claimed that the Company had "streamlined our operating configuration," and made assertions that the Company was investing in its facilities to achieve optimum performance.  Defendant Longhi stated:

> *We continue to make significant progress on improving our business model, lowering our breakeven point, improving our already industry-leading safety performance and strengthening our balance sheet.*
>
> We have faced and continue to face many challenges, some at the company level and some at the industry level.  *At the company level, we have streamlined our operating configuration, including the temporary idling of facilities to create greater production efficiencies under today's market conditions and have made many hard decisions to permanently address unprofitable businesses and facilities*, with a final resolution of our former operations in Canada now within our sight.

*  *  *

- 23 -

*We are accelerating our investments in our facilities, to achieve sustainably better and more consistent operating performance, including improvement in reliability, quality, delivery and customer service.*

60.     Further, during the conference call, when addressing whether the Company has invested and spent appropriately on the capital side as a result of the Carnegie Way, defendant Longhi stated:

I would offer that no, *we have not been under-spending.  What we have been doing is, we've only been able to accomplish what we've accomplished and gotten to the position that we are, because we've been investing appropriately in making sure that everything we know is being addressed and moving to minimize the conditions that we experienced in the past quarter, which is unplanned events.  So we've been able to get to this point because we've been doing all of the right things.*  The reality though is as we go into a different mix and we begin to operate under a much more tight condition every single thing that impacts, we don't have the capacity to more quickly recover.

61.     Defendant Longhi and Dan Lesnak ("Lesnak"), the Company's General Manager of Investor Relations, were asked about maintenance spending in 2016 and 2017 on the Company's U.S. Flat-Rolled facilities during the conference call.  Both individuals alleged that U.S. Steel was not cutting maintenance spending, stating:

<**A – Mano Longhi Filho**>: Yeah. Dan [Lesnak] has been working with the folks to get - we're in planning phase right now, but *if you look at some of the levels of operations that we've had this year compared to history, we certainly have a much more streamlined footprint with changes of nature in which - how much money you've spent.  But as we learn more about the opportunities that we have to continue to improve faster, we're going to be allocating-now, we do have a much better comfortable position to go address it in a better and faster manner, which will certainly increase or pro rata what we've been doing before.*  And Dan is going to be in a position to provide a little more clarity on that as we go forward.

<**A – Don Lesnak**>: And Phil, I'd just say that we did say we're going to spend more in 4Q to accelerate the improvements in the facilities.  That will bring us year-over-year pretty consistent with last year, and to Mario's point, we have a lot less facilities than we did last year.  *So I think if you think about maintenance actually on a per ton of capacity that is running, we're actually spending more on our facilities this year than we did last year.  So I think we're doing a pretty good job of addressing some challenges.  We're not cutting back.  We're getting things done a little bit faster now.*

- 24 -

62.     Finally, during the conference call, defendant Longhi boasted that the Company had "very significant levels of improvement" through the Carnegie Way, downplaying operational issues with its Flat-Rolled facilities.  Defendant Longhi stated:

> [W]e've had a quarter where some of the efforts had to be diverted a little bit to make sure that we addressed the unforeseen challenges that came our way.  But in spite of that, we still - *I think we ended the quarter with more than 300 new initiatives being completed.  And I think going into the next quarter, there are probably another 500 slated to be pursued.  So in the pipeline, it is even much greater than that.  So I wouldn't focus so much on the actual dollars that you saw coming out of this quarter.  I think there is more to come.  Eventually, these things will begin to taper off, as we get closer to the point of - that we can achieve an incredibly higher level of competitive base from a cost perspective* and that is the ultimate goal of what we're relentlessly pursuing.
>
> *On the other hand, the Carnegie Way also encompasses very significant levels of improvement.  On the overall value chain, you look at the amount of cash that we've been able to generate both from operations as well as the value chain and the logistics side of things.*  We're talking here about some different types of innovations and we just mentioned a couple of them here on packaging and automotive.  *So this whole context is what the Carnegie Way encompasses.  It is not just the cost* and I think we're going to continue to show interesting results in both fronts.

63.     U.S. Steel also released a slide presentation dated November 1, 2016 to coincide with the conference call.  The presentation reasserted that the Carnegie Way was "translating into stronger financial results and better performance for our investors, customers, and employees." The Company claimed that the Flat-Rolled segment produced positive results because "[o]ur improving cost structure continues to drive increases in our margins and the increase in domestic steel prices in the second quarter resulted in improved spot and contract price realizations." When discussing the Company's 2016 financial outlook, the presentation claimed that the Company's Flat-Rolled segment would be higher than 2015.  Crediting the Carnegie Way for "[i]mproved results despite operating challenges," the Company also touted its ability to grow and deal with the volatility of the steel industry, stating:

*The Flat-Rolled segment [financial results] … highlights our improving earnings power despite lower average realized prices.* The decisions we have made to exit unprofitable businesses, *aggressively address our cost structure, optimize our facility footprint for current market conditions, and generally address the things we can control, is resulting in a more profitable business.* Our average realized price is just beginning to move towards our average levels since the financial crisis of 2008, yet our EBITDA/ton is significantly higher….

\* \* \*

*Our pace of progress on the Carnegie Way transformation continues to exceed our expectations. The continuing benefits are improving our ability to earn the right to grow and then drive sustainable profitable growth over the long-term as we deal with the cyclicality and volatility of the global steel industry.* With over 7,500 active projects, we have many opportunities ahead of us.

64.     On January 31, 2017, U.S. Steel announced its fourth quarter and full year 2016 financial results in a press release. For the full year 2016, the Company reported a net loss of $440 million, or a $2.81 loss per diluted share, operating cash flow of $727 million, and adjusted EBITDA of $510 million. The Company further alleged that it realized $745 million in "Carnegie Way benefits." For the fourth quarter, the Company reported a net loss of $105 million, or $0.61 loss per diluted share, compared to fourth quarter 2015 net loss of $1.1 billion, or $7.74 loss per diluted share. The Company further alleged that full-year Flat-Rolled segment results for 2016 "improved from 2015 largely due to lower raw material costs, lower spending, and *benefits provided by our Carnegie Way efforts.*"

65.     In terms of financial outlook for 2017, the Company averred in the January 31, 2017 press release that results in the Flat-Rolled segment would be higher than 2016. The Company boasted:

*If market conditions,* which include spot prices, raw material costs, customer demand, import volumes, supply chain inventories, rig counts and energy prices, *remain at their current levels*, we expect:

- *2017 net earnings of approximately $535 million, or $3.08 per share, and EBITDA of approximately $1.3 billion;*

- ***Results for our Flat-Rolled, European, and Tubular segments to be higher than 2016;***

- ***To be cash positive for the year, primarily due to improved cash from operations;*** and

- Other Businesses to be comparable to 2016 and approximately $50 million of postretirement benefit expense.

We believe market conditions will change, and as changes occur during the balance of 2017, our net earnings and EBITDA should change consistent with the pace and magnitude of changes in market conditions.

66.     In the January 31, 2017 press release, the Company touted its ability to revitalize its assets through its Carnegie Way efforts.  The press release quoted defendant Longhi, stating:

> ***We entered 2016 facing very challenging market conditions, but remained focused on our Carnegie Way transformation efforts.  Despite lower average realized prices and shipments in 2016, our results are better as we continued to improve our product mix and cost structure.***  Our focus on cash, including better working capital management and opportunistic capital markets transactions, resulted in an improved debt maturity profile and stronger cash and liquidity.  ***We are well positioned to accelerate the revitalization of our assets to improve our operating reliability and efficiency, and deliver value-enhancing solutions to our customers.***
>
> \*   \*   \*
>
> ***We are starting 2017 with much better market conditions than we faced at the beginning of 2016.  Our Carnegie Way transformation efforts over the last three years have improved our cost structure, streamlined our operating footprint and increased our customer focus.  These substantive changes and improvements have increased our earnings power.***  While we ***will benefit from improved market conditions,*** they continue to be volatile and we must remain focused on improving the things that we can control.  Pursuing our safety objective of zero injuries, ***improving our assets and operating performance, and driving innovation that creates differentiated solutions for our customers remain our top priorities.***

67.     The Company held a conference call for analysts and investors on February 1, 2017 to discuss the fourth fiscal quarter and full year 2016 financial results, attended by defendants Longhi and Burritt.  Defendant Longhi claimed that the Carnegie Way was initiated to "***[r]educe our fixed costs and create a more flexible cost structure[,] [i]mprove the***

*capabilities, productivity and reliability of our facilities,* and improve our product mix by creating differentiated solutions for our customers." Defendant Longhi made claims about the positive impact of the Carnegie Way on the Company's financial results and its ability to capitalize on improved market conditions, stating:

> *The hard and competent work of the Carnegie Way transformation is translating into stronger financial results and better performance for our investors, customers* and employees. *As we have demonstrated over the last couple of years, we have a robust process in place that has consistently generated benefits even during times of difficult market conditions.*
>
> \* \* \*
>
> We have given you regular updates on the significant progress we have made on improving our cost structure and our increased focus on our customers through our commercial entities, which has resulted in the continuing improvement and our value-added product mix. *We have also been investing our facilities, and as we indicated last quarter*, increasing both the base and magnitude of our efforts in this area is a priority for this year.
>
> \* \* \*
>
> Our Carnegie Way transformation efforts have improved our cost structure, streamlined our operating footprint, and increased our customer focus. *These substantial changes and improvements have increased our earnings power, and while we will benefit from improved market conditions, they continue to be volatile.* We must remain focused on improving the things that we can control.
>
> \* \* \*
>
> *[O]ur blast furnace capacity is going to be capable of supplying whatever additional alternatives that we're going to find out there…. What we do anticipate is to be more reliable than we were so we can benefit from being able to roll more flat.*

68. Further, during the February 1, 2017 conference call, when asked by an analyst about volume improvement anticipated in the Company's Flat-Rolled segment in 2017, defendant Longhi maintained that the blast furnace capacity at the Company's facilities would be more reliable in 2017. Defendant Longhi claimed that the Company would see a 5% volume growth increase in 2017.

69.    In addition to the press release, the Company released a slide presentation dated January 31, 2017, discussing the Company's fourth quarter and full year 2016 financial results for the period ending December 31, 2016.  The Company reiterated that it received $745 million in Carnegie Way benefits associated with yield improvements for raw materials, steel producing, and finishing operations, as well as improved blast furnace fuel mix and usage rates in both its Flat-Rolled and U.S. Steel Europe segments.  U.S. Steel also credited the Carnegie Way with improving earnings power, pointing to the addition of $55 per ton of Carnegie Way benefits to the EBITDA of the Flat-Rolled segment.  The Company asserted promising earnings power due to its Carnegie Way efforts, stating:

> *We are starting 2017 with much better market conditions than we faced at the beginning of 2016.  Our Carnegie Way transformation efforts over the last three years have improved our cost structure, streamlined our operating footprint and increased our customer focus.  These substantive changes and improvements have increased our earnings power.*
>
> \*   \*   \*
>
> *Our pace of progress on the Carnegie Way transformation continues to exceed our expectations.  The continuing benefits are improving our ability to earn the right to grow and then drive sustainable profitable growth over the long-term as we deal with the cyclicality and volatility of the global steel industry.*  With over 4,000 active projects, we have many opportunities ahead of us.

70.    On February 28, 2017, the Company filed its 2016 Form 10-K with the SEC.  The 2016 Form 10-K repeated the promising financial statements in the January 31, 2017 press release.  Once again, the Individual Defendants lauded the efforts of the Carnegie Way, asserting that as a result of those efforts the Company could "withstand the prolonged downturn in steel prices while positioning us for success in a market recovery."  Specifically, the Individual Defendants claimed:

> In 2013, U. S. Steel launched a transformational process called the "Carnegie Way," named after the famed American industrialist and U. S. Steel co-founder Andrew Carnegie.  The Carnegie Way is a strategic, disciplined approach to

transforming the Company to address the new realities of the marketplace. Through the Carnegie Way, we focus on our strengths and where we can create the most value for all U. S. Steel stakeholders, including our stockholders, employees, customers and suppliers.  The Carnegie Way is a framework that helps employees address all aspects of our business and achieve sustainable improvements through process efficiencies and strategic investments.  *We have been working through a series of transformational initiatives that we believe will enable us to more effectively add value, respond to customer needs, get leaner faster, right-size our operations and improve our performance across our core business process capabilities, including commercial, supply chain, manufacturing, procurement, innovation, and operational and functional support.  Key accomplishments to date include a more intense focus on cash flow, a stronger balance sheet and a revised approach to how we view shipment volume and production.*  In pursuing our financial goals, we will not sacrifice our commitment to our core values of safety and environmental stewardship.  We also recognize that achieving this goal requires exemplary leadership and collaboration among all employees, and we are committed to attracting, developing and retaining a workforce with the talent, skills and integrity needed for our long-term success.  *The Carnegie Way has already driven a shift in the Company that has enabled us to withstand the prolonged downturn in steel prices while positioning us for success in a market recovery.*

71.     Defendants Burritt, Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey all signed the 2016 Form 10-K. Additionally, defendants Longhi and Burritt signed and certified the Form 10-K pursuant to SOX that the financial condition and results of operations of U.S. Steel were fairly presented in all material respects.

## THE BOARD ISSUES A MATERIALLY MISLEADING PROXY STATEMENT

72.     On March 14, 2017, defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey caused U.S. Steel to file its 2017 Proxy with the SEC for the Company's Annual Meeting of Stockholders held on April 25, 2017. In the 2017 Proxy, defendants solicited stockholder votes to, among other things, reelect defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey to the Board.  Defendants negligently issued materially

misleading statements with respect to these solicited votes.  Plaintiff disclaims any claim of fraud or knowing wrongdoing in connection with the misleading statements in the 2017 Proxy.

73.     In support of reelecting defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey, the 2017 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations and finances; and (ii) the Audit Committee exercised oversight of the Company's financial statements, and therefore the financial statements were appropriate for the Board to approve to include in the Company's Annual Report.  In particular, the 2017 Proxy stated that the Board must consider risk assessment and management, including financial results and projections:

**Board's Role in Risk Oversight**

Pursuant to its charter, the Audit Committee is responsible for reviewing and discussing the Corporation's policies with respect to the assessment of risks and risk management, including the following:

- the guidelines and policies that govern the process by which the assessment and management of the Corporation's exposure to risk are handled by senior management; and

- the Corporation's major risk exposures and the steps management has taken to monitor and control such exposures.

The Corporation's Internal Audit group provides regular reports to the Audit Committee on the results of various internal audit projects and provides recommendations for the enhancement of operational functions in order to reduce certain risks.  Although the Audit Committee has primary responsibility for overseeing risk management, each of our other Board committees also considers the risks within their specific areas of responsibility.  For example, the charter of the Compensation & Organization Committee gives it responsibility for assessing whether the Corporation's compensation and organization policies and practices for executives and non-executives are reasonably likely to create a risk that could have a material adverse effect on the Corporation.  Pursuant to its charter, the Corporate Governance & Public Policy Committee considers the risks associated with legislative, regulatory and public policy issues affecting the Corporation's businesses and operations.  Each committee regularly reports to the full Board on

their respective activities, including, when appropriate, those activities related to risk assessment and risk management oversight.

***The Board, as a whole, also considers risk assessment and risk management. For example, the Board annually reviews the Corporation's strategic plan which includes a review of risks related to:*** safety, environmental, operating and competitive matters; political and regulatory issues; employee and labor issues; and ***financial results and projections***.  Management regularly provides updates to the Board related to legal and compliance risks and cyber-security matters.

The Chief Risk Officer is responsible for the Corporation's financial and business risk management, including the assessment, analysis and monitoring of business risk and opportunities and the identification of strategies for managing risk.  The Chief Risk Officer provides regular reports to the Audit Committee and Board of Directors on these matters.

The Corporation believes that its leadership structure, as described above, supports the Board's role in risk oversight.

74.    Moreover, the 2017 Proxy included assertions that the Audit Committee reviewed and discussed with management the Company's financial statements and earnings press releases, and discussed policies regarding risk assessment and management.  Based on this review, the Audit Committee recommended to the Board that the financial statements be included in the Company's 2016 Form 10-K.  The 2017 Proxy stated:

**Audit Committee**

Pursuant to its charter, the Audit Committee's duties and responsibilities include:

- reviewing and discussing with management and the independent registered public accounting firm matters related to the annual audited financial statements, quarterly financial statements, earnings press releases and the accounting principles and policies applied;

- reviewing and discussing with management and the independent registered public accounting firm matters related to the Corporation's internal controls over financial reporting;

- reviewing the responsibilities, staffing and performance of the Corporation's internal audit function;

- reviewing issues that arise with respect to the Corporation's compliance with legal or regulatory requirements and corporate policies dealing with business conduct;

- being directly responsible for the appointment (subject to stockholder ratification), compensation, retention, and oversight of the work of the Corporation's independent registered public accounting firm, while possessing the sole authority to approve all audit engagement fees and terms as well as all non-audit engagements with such firm; and

- discussing policies with respect to risk assessment and risk management.

The charter requires the Audit Committee to perform an annual self-evaluation, review its charter each year and meet at least five times each year.  During the fiscal year ended December 31, 2016, the Audit Committee held five meetings.

The Audit Committee annually requests PwC to prepare a self-assessment utilizing the Center for Audit Quality, External Auditor Assessment Tool.  This best practice assists the Audit Committee in its oversight role and annual evaluation of PwC to assess the quality of the audit and to recommend the retention of PwC.  Based on this assessment, we believe the quality of PwC's services, communication and interaction with the Audit Committee is of a high standard.

The charter also requires the Audit Committee to be comprised of at least three directors, each of whom is independent and financially literate, and at least one of whom must have accounting or related financial management expertise.  Under the charter, no director who serves on the audit committees of more than two other public companies may serve on the Audit Committee, unless the Board determines that such simultaneous service will not impair the ability of such director to effectively serve on the Audit Committee.  No member of the Audit Committee serves on the audit committees of more than two other publicly traded companies.  The Board has determined that John J. Engel, the Committee's chairman, Dan O. Dinges, Murry S. Gerber, Stephen J. Girsky and David S. Sutherland meet the SEC's definition of audit committee financial expert.

* * *

## AUDIT COMMITTEE REPORT

***Our committee has reviewed and discussed U.S. Steel's audited financial statements for the year ended December 31, 2016 with U.S. Steel's management.***  We have discussed with the independent registered public accounting firm, PricewaterhouseCoopers LLP (PwC), the matters required to be discussed by Statements on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1. AU section 380), as adopted by the Public

Company Accounting Oversight Board in Rule 3200T. *We also discussed with U.S. Steel's management its assessment of the effectiveness of U.S. Steel's internal control over financial reporting as of December 31, 2016, and PwC's opinion on the effectiveness of U.S. Steel's internal control over financial reporting as of December 31, 2016.* We have received the written disclosures and the letter from PwC required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and we have discussed with PwC its independence. *Based on the aforementioned review and discussions, we recommended to the Board that the audited financial statements for U.S. Steel be included in U.S. Steel's Annual Report on Form 10-K for the year ended December 31, 2016, for filing with the Securities and Exchange Commission.*

75.     Defendants' statements misleadingly suggested that the Board: (i) maintained sufficient compliance, review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.   The 2017 Proxy omitted any disclosures that: (i) the Company was cutting costs and delaying investments in capital assets, rendering U.S. Steel unable to capitalize on improved market conditions; (ii) the Company's failure to upgrade capital assets increased production costs, negatively impacting its financial results; and (iii) the Company boosted short-term financial results at the expense of upgrading capital assets, causing long-term delays in improved financial performance.

76.     The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements.   Most importantly, the Company was incorrectly boosting its short-term revenues and earnings at the expense of maintaining capital assets, and therefore, its financial statements were not appropriate to include in the Company's Annual Report.   Defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey were negligent in making these misleading statements in the 2017 Proxy.

77.     The 2017 Proxy harmed U.S. Steel by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholder's right to vote for directors.  As a result of the defendants' misleading statements in the 2017 Proxy, U.S. Steel's stockholders voted to reelect defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey to U.S. Steel's Board.

## THE TRUTH EMERGES

78.     After the defendant directors had secured their reelection on April 25, 2017, and the markets had closed that day, the Company issued a press release announcing its financial results for the first quarter of 2017 ended March 31, 2017.  Market conditions improved drastically over the first quarter, with the price of U.S. hot-rolled steel rising more than 50% from the previous year.  Despite this upturn, U.S. Steel was unable to capitalize, primarily due to operational issues in the Flat-Rolled segment.  In the press release, the Company revealed dismal financial results despite the Company's earlier promising guidance.

79.     Specifically, in the April 25, 2017 press release, the Company reported a net loss of $180 million, or $1.03 loss per diluted share, well below analysts' expectations.  The Company further announced adjusted EBITDA of $74 million, and negative operating cash flow of $135 million, associated with previously stalled investment in working capital during the quarter.  The press release stated:

> ***First quarter results for our Flat-Rolled segment declined significantly compared with the fourth quarter,*** as we expected, primarily due to higher raw material costs, increased planned outage costs, seasonally lower results from our mining operations, and restart costs associated with the Granite City hot strip mill and our Keetac iron ore mine.  Also contributing to the decline in results was a $20 million charge from using the last-in-first-out (LIFO) inventory method in the first quarter, while we recognized a $40 million LIFO benefit in the fourth quarter.  These factors were only partially offset by higher average realized prices and benefits from slightly increased shipments that were limited by operating challenges at our facilities.

80.     Compounding the worsening first quarter financials, the Company was forced to substantially reduce its 2017 guidance by more than half, cutting net earnings from $535 million to $260 million, and taking away any language reflecting a positive cash flow in 2017.  After an accounting change of $175 million, the adjusted diluted EPS was approximately $0.83, which was a 72% cut from the previous EPS guidance for 2017.  With regard to the dramatic change in 2017 guidance, the press release stated:

> If market conditions, which include spot prices, raw material costs, customer demand, import volumes, supply chain inventories, rig counts and energy prices, remain at their current levels, we expect:
>
> - 2017 net earnings of approximately $260 million, or $1.50 per share, and adjusted EBITDA of approximately $1.1 billion;
>
> - Results for our Flat-Rolled, European, and Tubular segments to be higher than 2016; and
>
> - Other Businesses to be comparable to 2016 and approximately $50 million of postretirement benefit expense.
>
> We believe market conditions will change, and as changes occur during the balance of 2017, we expect these changes to be reflected in our net earnings and adjusted EBITDA.

81.     Also in the press release, defendant Longhi acknowledged that the Flat-Rolled segment faced operating issues, stating:

> While our segment results improved by over $200 million compared with the first quarter of 2016, *operating challenges at our Flat-Rolled facilities prevented us from benefiting fully from improved market conditions.*  However, we continue to be encouraged by the strength of our European business and we are also seeing improving energy markets.  Overall, improved commercial conditions more than offset higher raw materials and energy costs and increased maintenance and outage spending driven by our asset revitalization efforts.  The execution of our asset revitalization program and the continued implementation of reliability centered maintenance practices are critical to achieving sustainable improvements in our operating performance and costs.  We have built the financial strength and resources to move forward more aggressively on these initiatives, and remain focused on providing the service and solutions that will create value for our stockholders, customers, employees, and other stakeholders.

* * *

**2017 Outlook**

Market conditions have continued to improve, and we will realize greater benefits as these improved conditions are recognized more fully in our future results.  We are focused on long-term and sustainable improvements in our business model that will position us to continue to be a strong business partner that creates value for our customers.  This remains a cyclical industry and we will not let favorable near-term business conditions distract us from taking the outages we need to revitalize our assets in order to achieve more reliable and consistent operations, improve quality and cost performance, and generate more consistent financial results.  We issued equity last August to give us the financial strength and liquidity to position us to establish an asset revitalization plan large enough to resolve our issues, and to see that plan through to completion.  As we get deeper into our asset revitalization efforts, we are seeing opportunities for greater efficiency in implementing our plan.  We believe we can create more long-term and sustainable value by moving faster now.  ***We have made the strategic decision to accelerate our efforts to resolve the issues that challenge our ability to achieve sustainable long-term profitability.***  We believe our objective to achieve economic profit across the business cycle will result in true value creation for all of our stakeholders over the long-term.

82.     The following day on April 26, 2017, the Company held a conference call to discuss the first quarter financial results.  Defendants Longhi and Burritt participated in the call.  Defendants admitted that the Company's asset revitalization investment would exceed $300 million for 2017 and more than $1 billion over the next several years.  Acknowledging the need to markedly increase asset revitalization in 2017 and additional downtime at the Company's facilities, defendant Longhi stated:

Last quarter, we discussed the comprehensive asset revitalization plan we're implementing to improve our profitability and competitiveness and to meet or exceed the increasing expectations of our customers.

***This is a multi-year plan that will take three to four years till full implementation and is not just sustaining capital and maintenance spending.***  These projects will deliver both operational and commercial benefits.  As we get deeper into our asset revitalization efforts, we are seeing opportunities for greater efficiency in implementing our plan. We believe we can create more long term and sustainable value by moving faster now, ***and we have made a strategic decision to accelerate our efforts, to address some of the issues and implement***

*the improvements that will enhance our ability to achieve sustainable long-term profitability.*

*As a result of this acceleration, we now expect our investment in asset revitalization in 2017 to be approximately $300 million higher than it was in 2016.  We will be taking more downtime at our facilities, which will limit our steel production volumes.*  And with the restart of our Lone Star welded pipe mill, that I mentioned earlier, we'll resume shipping hot-rolled bands to our Tubular segment.  *Based on these factors, we will have fewer tons available to offer into the spot market after taking care of our strategic customers' requirements.*

We currently expect our flat-rolled shipments to third-party customers will be approximately 10 million tons this year.

83.     On this news, U.S. Steel's market capitalization plunged more than 26%, or $8.33 per share, on April 26, 2017, to close at $22.78 compared to the previous trading day's closing of $31.11, erasing more than $1.4 billion in market capitalization in a single day.  The stock price has yet to recover, remaining at or below $24 per share as of the filing of this lawsuit.

84.     On May 10, 2017, the Company announced in a press release that defendant Longhi was relinquishing his role as CEO to defendant Burritt.  Despite their contributions to the wrongdoing described herein, defendants Longhi and Burritt have received particularly significant compensation.  Even with the surprisingly dismal financial results despite hot-rolled steel price increases, the Company announced that defendant Longhi would receive full retirement compensation upon his departure in June 2017, a total compensation package of over $22 million.  Further, in a Current Report on Form 8-K filed on June 1, 2017, with the SEC, the Company announced that defendant Burritt, the former COO and CFO, would receive additional compensation for replacing defendant Longhi as CEO and President.  Defendant Burritt is to receive an increased salary of $1 million, annual target award under the Company's annual incentive compensation plan at 140% of base salary, annual target grant under the Company's long-term incentive plan of over $6 million, and additional incentive awards for 2017 of over $2 million.  This is despite his participation in the improper statements as CFO and COO, as well as

his contribution to the detrimental business strategy that culminated in dismal first quarter results.

## REASONS THE STATEMENTS WERE IMPROPER

85.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     the Company was cutting costs and delaying investments in capital assets, rendering U.S. Steel unable to capitalize on improved market conditions;

(b)     the Company's failure to upgrade capital assets increased production costs, negatively impacting its financial results;

(c)     the Company boosted short-term financial results at the expense of upgrading capital assets, causing long-term delays in improved financial performance; and

(d)     as a result of the foregoing, the officers' and directors' representations concerning U.S. Steel's business, operations, and prospects associated with the Carnegie Way initiative were improper.

## DAMAGES TO U.S. STEEL

86.     As a result of the Individual Defendants' improprieties, U.S. Steel disseminated improper, public statements concerning the Company's ability to capitalize on improved market conditions under the Carnegie Way.  These improper statements have devastated U.S. Steel's credibility as reflected by the Company's more than $1.4 billion, or 26%, market capitalization loss.

87.     U.S. Steel's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, U.S. Steel's current and potential

customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions.  Given the substantial market capitalization loss U.S. Steel incurred as a result of the improper statements, U.S. Steel's ability to raise equity capital or debt on favorable terms in the future is now seriously impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

88.     Further, as a direct and proximate result of the Individual Defendants' actions, U.S. Steel has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)     costs incurred to investigate wrongdoing; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to U.S. Steel.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

89.     Plaintiff brings this action derivatively in the right and for the benefit of U.S. Steel to redress injuries suffered, and to be suffered, by U.S. Steel as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  U.S. Steel is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

90.     Plaintiff will adequately and fairly represent the interests of U.S. Steel in enforcing and prosecuting its rights.

91.     Plaintiff was a stockholder of U.S. Steel at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current U.S. Steel stockholder.

92.     The current Board of U.S. Steel consists of the following twelve individuals: defendants Burritt, Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Mascarenas, McNeal, Stevens, Sutherland, and Tracey.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Burritt, Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Mascarenas, McNeal, Stevens, Sutherland, and Tracey Face a Substantial Likelihood of Liability for Their Misconduct**

93.     As alleged above, defendants Burritt, Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Mascarenas, McNeal, Stevens, Sutherland, and Tracey breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's ability to capitalize on a market upturn under the Carnegie Way initiative, when in fact, U.S. Steel had engaged in systematic cost cutting and diminished revitalization of its critical capital assets.  Specifically, in public filings filed with the SEC and public announcements made to investors, the Board averred to the investing public that the Carnegie Way initiative had a positive effect on revenues and earnings.  The Company further claimed that the Carnegie Way had a material impact on the Company's ability to maximize profits whenever steel prices would make a turnaround.  The Board also claimed that the Company was engaged in revitalization of its capital assets.  These materially misleading statements boosted the Company's promising financial reports associated with the Carnegie Way

and the Company's financial outlook.   In reality, the Company alleged short-term growth in revenue and earnings at the expense of upgrading capital assets, causing long-term delays in improved financial performance.

94.     Defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Mascarenas, McNeal, Stevens, Sutherland, and Tracey are responsible for the negligently made statements in the materially misleading 2017 Proxy.   It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.   Accordingly, an indemnification provided by the Company to defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Mascarenas, McNeal, Stevens, Sutherland, and Tracey does not protect them for violations of section 14(a) in the 2017 Proxy.   Accordingly, defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Mascarenas, McNeal, Stevens, Sutherland, and Tracey face a substantial likelihood of liability, excusing a demand.

95.     Defendants Dinges, Engel, Gerber, Girsky, Mascarenas, McNeal, and Sutherland, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.   The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.   Furthermore, the Charter provides that the Audit Committee has a duty to assist the Board in oversight of the Company's financial statements.   Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.   Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.   Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.   Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they

participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused as to Defendant Burritt Because He Lacks Independence**

96.     The principal professional occupation of defendant Burritt is his employment with U.S. Steel, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, defendant Burritt lacks independence from defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Mascarenas, McNeal, Stevens, Sutherland, and Tracey due to his interest in maintaining his executive position at U.S. Steel.   This lack of independence renders defendant Burritt incapable of impartially considering a demand to commence and vigorously prosecute this action.   U.S. Steel paid defendant Burritt the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $800,000 | $891,720 | $447,864 | $1,820,000 | $116,000 | $4,075,584 |

Accordingly, demand is futile as to defendant Burritt.

97.     Plaintiff has not made any demand on the other stockholders of U.S. Steel to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     U.S. Steel is a publicly held company with over 174 million shares outstanding as of April 20, 2017, and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey for Violation of Section 14(a) of the Exchange Act**

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except any allegation of fraud.

99.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey.  The section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

100.    Defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2017 Proxy.  The 2017 Proxy contained proposals to the Company's stockholders that they vote to reelect the members of the Board.  The 2017 Proxy, however, misrepresented and failed to disclose and explain that: (i) the Company was cutting costs and delaying investments in capital assets, rendering U.S. Steel unable to capitalize on improved market conditions; (ii) the Company's failure to upgrade capital assets increased production costs, negatively impacting its financial results; and (iii) the Company boosted short-term financial results at the expense of upgrading capital assets, causing long-term delays in

improved financial performance.   By reasons of the conduct alleged herein, defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey violated section 14(a) of the Exchange Act.   As a direct and proximate result of the violation, stockholders voted in favor of reelecting defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey to the Board. Defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey's reelection led the continuation of the wrongful practices described herein.

101.    Plaintiff, on behalf of U.S. Steel, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Dennis, Dinges, Drosdick, Engel, Gerber, Girsky, Longhi, Mascarenas, McNeal, Stevens, Sutherland, and Tracey based upon the false and misleading 2017 Proxy, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    The Individual Defendants owed and owe U.S. Steel fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants owed and owe U.S. Steel the highest obligation of good faith, fair dealing, loyalty, and due care.

104.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.   More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within U.S. Steel, and/or

consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

105.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Company was cutting costs and delaying investments in capital assets, rendering U.S. Steel unable to capitalize on improved market conditions; (ii) the Company's failure to upgrade capital assets increased production costs, negatively impacting its financial results; and (iii) the Company boosted short-term financial results at the expense of upgrading capital assets, causing long-term delays in improved financial performance.    Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

106.    Director Defendants, as directors of the Company, owed U.S. Steel the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper statements.   The Director Defendants knew or were reckless in not knowing that: (i) the Company was cutting costs and delaying investments in capital assets, rendering U.S. Steel unable to capitalize on improved market conditions; (ii) the Company's failure to upgrade capital assets increased production costs, negatively impacting its financial results; and (iii) the Company boosted short-term financial results at the expense of upgrading capital assets, causing long-term delays in improved financial performance.   Accordingly, the Director Defendants breached their duty of loyalty to the Company.

107.    The Audit Committee Defendants, Dinges, Engel, Gerber, Girsky, Mascarenas, McNeal, and Sutherland, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew

or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Dinges, Engel, Gerber, Girsky, Mascarenas, McNeal, and Sutherland failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

108.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, U.S. Steel has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

109.    Plaintiff, on behalf of U.S. Steel, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Waste of Corporate Assets**

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    As a result of the Individual Defendants' failure to implement adequate disclosure procedures to ensure that the Company's SEC filings were accurate, U.S. Steel is subject to a securities fraud class action lawsuits. The Individual Defendants have caused U.S. Steel to waste its assets by defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

112.    In addition, the Individual Defendants have caused U.S. Steel to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty. This includes, among other things, the Board's decision to provide defendant Longhi with over $22 million in compensation upon his retirement and approve defendant Burritt's increased salary and incentives package of over $10 million for the

coming year.   The Board approved the decision to offer defendants Longhi and Burritt this compensation despite knowing of defendants Longhi's and Burritt's significant breaches of fiduciary duty.

113.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

114.   Plaintiff, on behalf of U.S. Steel, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

115.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of U.S. Steel.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to U.S. Steel.

117.   Plaintiff, as a stockholder and representative of U.S. Steel, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

118.   Plaintiff, on behalf of U.S. Steel, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of U.S. Steel, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.      Directing U.S. Steel to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect U.S. Steel and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

2.      a proposal to strengthen the Company's controls over risk management and assessment;

3.      a proposal to strengthen the Company's controls over public statements and SEC filings;

4.      a proposal to strengthen the Company's controls over financial reporting; and

5.      a provision to permit the stockholders of U.S. Steel to nominate at least three candidates for election to the Board.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of U.S. Steel has an effective remedy;

D.      Awarding to U.S. Steel restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 31, 2017

/s/ Richard K. Witchko
Richard K. Witchko (PA 18129)
3751 Gibsonia Road
Gibsonia PA 15044
Phone: (724) 444-4311
Email: rwitchko@earthlink.net


ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
STEVEN M. MCKANY
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
      gaguilar@robbinsarroyo.com
      smckany@robbinsarroyo.com

Attorneys for Plaintiff

1189127_9